UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CYNTHIA SIBLEY,
O.B.O. J.S.,

    Plaintiff,                                Hon. Paul L. Maloney

v.                                          Case No. 1:19-cv-704

PRIORITY HEALTH,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

       This matter is before the Court on Plaintiff's Motion for Entry of Judgment, (ECF No. 14), and Defendant's Motion to Affirm the Administrator's Decision, (ECF No. 15). Pursuant to 28 U.S.C. § 636(b)(1)(B), the undersigned recommends that Plaintiff's motion be granted in part and denied in part and Defendant's motion be denied.

## BACKGROUND

       In her First Amended Complaint (ECF No. 9) Plaintiff alleges the following. J.S., born March 11, 1999, suffers from "a psychiatric disorder involving very serious behavior dysfunction." Specifically, J.S. suffers from Autism Spectrum Disorder, Obsessive Compulsive Disorder, Anxiety, and Intellectual Disability. J.S. is also nonverbal.

       J.S. daily engages in "persistent and frequent disruptive, aggressive, self-injurious, destructive and dangerous behaviors." J.S.'s behaviors in this regard,

-1-

despite various modes of treatment, have "significantly worsened," placing herself and others at "severe risk of injury." J.S.'s care providers concluded that, due to the complexity of J.S.'s condition, as well as the threat she presents to herself and others, "specialized, long-term inpatient hospitalization" was required to "effectively treat her maladaptive behaviors, particularly self-injury and aggression."

In an effort to secure appropriate treatment for J.S., Plaintiff reached out to the Kennedy Krieger Institute (KKI) to determine whether J.S. would benefit from treatment at KKI's Neurobehavioral Unit (NBU). J.S., through her father, enjoys health insurance coverage through Defendant Priority Health. On March 6, 2018, KKI requested from Priority Health authorization to treat J.S. in its NBU for a four-month period. Defendant initially authorized J.S.'s treatment request, but later determined that coverage for such treatment was not authorized after August 16, 2018. Plaintiff unsuccessfully appealed the matter with the final decision denying insurance coverage issuing on March 8, 2019.

Plaintiff initiated this action on August 29, 2019, against Priority Health alleging that its decision to terminate coverage for J.S.'s treatment as of August 16, 2018, violates the Employee Retirement Income Security Act (ERISA). Plaintiff requests that the Court order Priority Health to "cover the full cost and expenses of J.S.'s treatment in the NBU program from August 16, 2018 through discharge." Plaintiff also requests that Defendant reimburse her reasonable attorney's fees and costs.

Plaintiff now moves for judgment on her claims. Defendant likewise has moved to affirm its decision denying J.S.'s insurance coverage claims.

## LEGAL STANDARD

The parties have stipulated that the de novo standard of review applies in this matter, pursuant to which the Court's role "is to determine whether the administrator . . . made a correct decision." *Ross v. Reliance Standard Life Ins. Co.*, 112 F.Supp.3d 620, 622 (W.D. Mich. 2015) (citations omitted). The Court's review is limited to the record that was before the administrator whose decision is accorded neither deference nor presumption of correctness. In sum, the Court "must determine whether the administrator properly interpreted the plan and whether the insured was entitled to benefits under the plan." *Ibid* (citations omitted).

## ANALYSIS

I.  Relevant Policy Language

Defendant terminated J.S.'s insurance coverage on the ground that continued in-patient treatment at the KKI NBU was not medically necessary. The policy defines Medically/Clinically Necessary as follows:

> The services or supplies needed to diagnose or treat your physical or mental condition. Whether services or supplies are Medically/Clinically Necessary is determined in accordance with Priority Health's medical and behavioral health policies or adopted criteria that have been approved by community Physicians and other Providers. This determination is made by Priority Health's Medical Director, or anyone acting at the Medical Director's direction, in consultation with other Physicians. Medically/Clinically Necessary

mental health and substance abuse services are determined by our Behavioral Health Department.

In order to be considered Medically/Clinically Necessary, the services or supplies must:

(a)     be widely accepted as effective;

(b)     be appropriate for the condition or diagnosis;

(c)     be essential, based upon nationally accepted evidence-based standards;

(d)     cost no more than a treatment that is likely to yield a comparable health outcome; and

(e)     is the most appropriate level of care and site of service which can be safely and reasonably provided to the Member.

(f)     for procedural services:

       (i)     surgically appropriate for the condition or diagnosis based on nationally accepted, evidence-based standards;

       (ii)     personally appropriate following use of a shared decision making process to insure full informed consent[;]

       (iii)     medically appropriate based on adequate management of medical comorbidities and risk factors for death or complications[.]

The determination of whether proposed care is a Covered Service is independent of, and should not be confused with, the determination of whether proposed care is Medically/Clinically Necessary.

(ECF No. 13-33, PageID.2476).

The Policy further articulates that the following services are "non-covered" as "not medically/clinically necessary":

    (a)    services rendered by a Health Professional that do not require the technical skills of such a Provider;

    (b)    those services and supplies furnished mainly for the personal comfort or convenience of you, anyone who cares for you, or anyone who is part of your family;

    (c)    those services and supplies furnished to you as an inpatient on any day on which your physical or mental condition could safely and adequately be diagnosed or treated as an outpatient;

    (d)    any service or supply beyond those services sufficient to safely and adequately diagnose or treat your physical or mental condition; and

    (e)    additional or repeated services or treatments of no demonstrated additional benefit.

(ECF No. 13-33, PageID.2456-57).

Finally, the Policy also provides that, as to "mental health services," "custodial care" is deemed a "non-covered" service. (ECF No. 13-33, PageID.2447-48).

## II.  Administrative Denials

Before analyzing the deficiencies in Defendant's actions, an examination of the various administrative decisions underlying these actions is necessary.[1]

---

[1] At the outset, the Court must address Plaintiff's argument that Defendant erred because the individuals who reviewed the record on Defendant's behalf did not possess the appropriate credentials. As the Sixth Circuit has observed, "ERISA does not demand an examination by the narrowest of specialists," but rather merely obligates plan administrators to "retain health care professionals in the specific field of medicine at issue." *Okuno v. Reliance Standard Life Ins. Co.*, 836 F.3d 600, 610 (6th Cir. 2016). Defendant, by employing psychiatrists, has satisfied this requirement. Accordingly, this argument is rejected.

On August 9, 2018, Priority Health determined that "inpatient (IP) treatment [for J.S.] was not approved for [August 16, 2018] and forward." (ECF No. 13-46, PageID.4316-17). Defendant's decision was premised on its conclusion that continued inpatient treatment for J.S. was not medically necessary. (*Id.*). In support of this determination, Defendant relied upon an August 9, 2018, report authored by Dr. Leslie Taylor, a psychiatrist who did not examine J.S. (ECF No. 13-46, PageID.4314-15).

In her brief two-page report,[2] Dr. Taylor noted that J.S. "does have difficulties with self-injurious behaviors, can be aggressive, have tantrums, and engage in inappropriate sexual behaviors." (*Id.* at PageID.4314). The doctor noted that J.S.'s behaviors often mandate that she wear "protective gear" and be placed "in a padded treatment room." (*Id.*). The doctor noted that, while the frequency of J.S.'s outbursts had decreased while in the NBU, "her outbursts do require two staff to attend to them." (*Id.*).

Despite these observations, Dr. Taylor concluded that further inpatient treatment was not medically necessary and that J.S. could instead be successfully treated as an outpatient. (*Id.*, 4315). In support of this determination, Dr. Taylor observed that J.S. was "making progress" and "has had significant improvements." (*Id.*, 4315). Dr. Taylor further observed that J.S.'s "ongoing stay on the inpatient unit *appears* due to custodial difficulties while looking for appropriate placement." (*Id.*) (emphasis

---

[2] While the doctor's report totals two pages, her actual analysis is less than one page in length.

added). Dr. Taylor did not indicate which portions of the medical record, if any, she reviewed to support her decision.[3]

Defendant subsequently attempted to bolster its coverage denial decision by obtaining a report, dated August 24, 2018, from Dr. Scott Gordon, a psychiatrist who likewise did not examine J.S.[4] (ECF No. 13-46, PageID.4327-28). Dr. Gordon likewise determined that continued inpatient care for J.S. was not medically necessary. (*Id.*). In support of this conclusion, the doctor observed that J.S. "continues to have aggressive and self-harming behaviors, however, these are unlikely to respond at her current level of care." (*Id.*, PageID.4328). Despite concluding that inpatient care was unlikely to improve J.S.'s condition, Dr. Gordon determined that J.S. could nevertheless receive adequate care as an outpatient. (*Id.*). Dr. Gordon likewise did not indicate which portions of the medical record, if any, he reviewed to support his decision.[5]

In response to an appeal by Plaintiff and KKI, Priority Health, in a decision dated November 21, 2018, rejected this appeal and affirmed its prior decision. (ECF No. 13-4, PageID.233-35). In support of this determination, Defendant merely cited to the

---

[3] On the form she completed, the doctor, under the heading "materials reviewed," reported only "information related to review." (*Id.*, PageID.4314). This is a circular statement that conveys no meaningful information.

[4] Dr. Gordon, like Dr. Taylor, submitted a two-page form report, the analysis portion of which is barely one-half page in length.

[5] On the form he completed, the doctor, under the heading "materials reviewed," reported only "written documentation related to review." (*Id.*, PageID.4327). Again, this circular statement conveys no meaningful information.

reports authored by Drs. Taylor and Gordon, as well as the policy language quoted above. (*Id.*). This determination was affirmed by Defendant on December 26, 2018. (ECF No. 13-26, PageID.2219-21). The rationale for this determination mirrored the rationale articulated by Defendant in its November 21, 2018, decision.

Plaintiff subsequently appealed the matter to the Michigan Department of Insurance and Financial Services (MDIFS). (ECF No. 13-4, PageID.177). On March 20, 2019, the MDIFS issued a decision "uphold[ing] Priority Health's final adverse determination." (ECF No. 13-25, PageID.2208-12). In support of this decision, the MDIFS relied on an "independent review" performed by an unidentified "board certified psychiatrist." (ECF No. 13-25, PageID.2211). This psychiatrist concluded that further inpatient care for J.S. was "not considered to be medically necessary." (*Id.*). In support of this conclusion, the psychiatrist cited to unidentified treatment notes allegedly authored August 16, 2018. (*Id.*). According to the reviewer, these treatment notes revealed that J.S. was "compliant" and exhibiting "no negative behaviors." (*Id.*).

The Court notes that Defendant, in its pleadings in this Court, has failed to identify in the record the treatment notes this unidentified psychiatrist purportedly reviewed. The Court is not suggesting that such records do not exist, but neither is it this Court's responsibility to sift through the voluminous administrative record and locate unidentified evidence that might advance Defendant's cause. *See, e.g., Emerson v. Novartis Pharm. Corp.*, 446 Fed. Appx. 733, 736 (6th Cir., Aug. 23, 2011) ("judges are not like pigs, hunting for truffles that might be buried in the record").

The conclusions articulated by this unidentified records reviewer are so deficient as to be rejected out-of-hand. This person appears to have based his or her decision on observations taking place over a brief period of time on a single day. Such is patently unreasonable. *See, e.g., Shaw v. AT & T Umbrella Benefit Plan No. 1*, 795 F.3d 538, 549 (6th Cir. 2015) (a plan administrator "acts arbitrarily and capriciously when it engages in selective review of the administrative record to justify a decision to terminate coverage"). As the evidence demonstrates, J.S. continued to consistently engage in serious negative behaviors well after August 16, 2018. (ECF No. 13-44 at PageID.3985, 3997, 4027, 4168).

III. Defendant's Denial of Coverage is Unsupportable

As discussed below, the shortcomings in Defendant's coverage denial decision can, generally speaking, be placed into three categories: (1) unreasonably conflating the concept of "discharge planning" with the unfounded conclusion that J.S. was "discharge ready"; (2) unreasonably concluding that because J.S. had made significant progress while in the NBU that further inpatient treatment was not medically necessary; and (3) unreasonably concluding that J.S., as of August 2018, could receive the same level of care or outcomes in an outpatient setting.

In addition to the specific shortcomings discussed below, another factor informing the Court's analysis, and undermining Defendant's position, is the fact that Defendant, despite having the right to personally examine J.S. (*see* ECF No. 13-34, PageID.2526), failed to do so. It is certainly true that Defendant was not *required* to personally

examine J.S.  *See, e.g., Kalilsh v. Liberty Mutual/Liberty Life Assur. Co. of Boston*, 419 F.3d 501, 508 (6th Cir. 2005).   Nevertheless, a plan administrator's failure to examine a claimant is a factor the Court may consider when assessing the plan administrator's decision.  *Ibid.*  In this respect, it must be noted that courts consistently recognize that when a claimant suffers from a mental or emotional impairment, denying benefits based on nothing more than a record review constitutes a "questionable" basis to deny benefits.  *See, e.g., Okuno*, 836 F.3d at 610 (citation omitted); *Chamness v. Liberty Life Assur. Co. of Boston*, 234 F.Supp.3d 885, 894-95 (W.D. Mich. 2017) (collecting cases).

    A.    Discharge Planning versus Discharge Ready

From the outset, the individuals reviewing the record on Defendant's behalf have unreasonably concluded that, because KKI was engaged in "discharge planning" for J.S., that J.S. had, therefore, attained her treatment goals and was ready to be discharged. Accordingly, Defendant argues that "[i]t appears that the real problem here is not medical, but residential."   (ECF No. 15, PageID.4641).

It is reasonable for a facility such as KKI to engage in "discharge planning" from the moment a patient arrives, if not even sooner.  It is apparent from the record that the patients receiving treatment at KKI are suffering significant mental and physical impairments for which on-going care after departing KKI will often be necessary. Failure by KKI to consider such from the outset would, in the Court's estimation, be neither reasonable nor prudent.  Thus, as one of the records cited by Defendant notes, J.S.'s care providers were engaged in "discharge planning" less than one week after J.S.'s

arrival at KKI.  (ECF No. 13-5, PageID.298).  Specifically, on March 14, 2018, one of J.S.'s care providers noted, "[a]t this point, the only barriers to discharge involved locating appropriate in-home support staff which has previously been a significant challenge for the family . . . ."  (*Id.*).  Likewise, the record contains other references to "discharge planning" and the attempts to secure proper placement for J.S. when she was ready to be discharged.  (ECF No. 13-13, PageID.1040; ECF No. 13-18, PageID.1673; ECF No. 13-20, PageID.1964).

Defendant is correct that locating an appropriate placement for J.S. following her treatment at the NBU was a "barrier" that had to be overcome.  But the mistake that Defendant's representatives repeatedly made was equating recognition of this barrier, and attempts to overcome such, with the conclusion that J.S. had completed her treatment in the NBU and was "discharge ready."  Defendant has cited nothing in the record to support this conclusion.

The Court recognizes that it may be within the purview of the professionals reviewing the record on Defendant's behalf to independently make the assessment that J.S. had, as of August 16, 2018, met her treatment goals and was, therefore, ready to be discharged.  To the extent these record reviewers made such an independent assessment, such is utterly unpersuasive because, as already noted, the reports by the individuals who reviewed the records in this matter are extremely brief and provide only unsubstantiated conclusions devoid of analysis or citation to the record.  *See, e.g., Shaw*, 795 F.3d at 548-49 (if a plan administrator denies coverage based on its having

-11-

formulated an alternative diagnosis and/or treatment plan, the administrator "must" articulate its "reasons for adopting an alternative opinion").

  B.  Progress Does Not Necessarily Equal Completion

Another glaring error made by Defendant is the unsubstantiated, and illogical, conclusion that, because J.S. had made significant progress while in the NBU, she had met her treatment goals and could, therefore, be safely discharged. As Defendant correctly notes, the record contains many references to the fact that J.S. was making significant progress in the NBU. Defendant has failed to identify anything in the record, however, supporting the conclusion that J.S. had met her treatment goals or that her condition was no longer continuing to improve with further treatment.

Instead, Defendant appears to have simply concluded that, because J.S. had made significant progress, coverage for further treatment was unnecessary. By Defendant's logic, coverage can be terminated based upon the amount of progress a patient has achieved rather than a consideration whether additional treatment is still necessary and effective. Defendant laments Plaintiff's alleged failure to cite to the Policy language in her pleadings, while employing a logic that, in effect, attempts a wholesale revision of the language in question.

In effect, Defendant's argument interprets the Policy to deny coverage once the patient achieves some undefined quantum of success. Defendant has cited to nothing in the Policy supporting this rationale or interpretation. Instead, as previously noted, the question is whether continued treatment is medically necessary. While Defendant

concluded that further treatment for J.S. was not medically necessary, it has failed to identify evidence supporting this conclusion. Defendant's unsubstantiated conclusions that such was the case are unpersuasive and unsupported and are, therefore, rejected.

    C.    Inpatient versus Outpatient Care

Finally, the conclusion by Defendant that J.S. could receive adequate care, as of August 16, 2018, in an outpatient setting is unsupported. The shortcoming of Defendant's position in this regard is obvious by simply reviewing the reports completed Drs. Taylor and Gordon. Dr. Taylor acknowledged that J.S. was still engaging in self-injurious behaviors as of August 9, 2016, which required two staff members, the use of protective gear, and a padded room to control. (ECF No. 13-46, PageID.4314-15). The doctor offers no rationale, and cites to no evidence, for her conclusion that J.S. could nevertheless receive adequate care in an outpatient setting.

Dr. Gordon's rationale and conclusions enjoy no more support. The doctor acknowledged that, as of August 16, 2018, J.S. was continuing to engage in "aggressive and self-harming behaviors." (ECF No. 13-46, PageID.4327-28). The doctor's conclusion that these behaviors "are unlikely to respond at her current level of care" stands in stark contrast to the overwhelming evidence, acknowledged by Defendant, that J.S. made significant progress while in the NBU. Moreover, despite concluding that inpatient care was "unlikely" to improve J.S's circumstance, Dr. Gordon nevertheless concludes that J.S. could receive adequate care in an outpatient setting. The doctor articulates no rationale and cites no evidence to support this illogical

assertion. Simply put, Defendant has failed to cite evidence in the record, or articulate any reasonable argument, that J.S. could have, as of the date in question, received adequate or appropriate care in an outpatient setting. The Court likewise rejects, as utterly unsupported, Defendant's argument that KKI was merely providing "custodial care" to J.S., after August 16, 2018.

IV. Continued Inpatient Treatment at KKI was Medically Necessary

Having detailed the many deficiencies in Defendant's decision-making process, the question becomes whether inpatient care for J.S. beyond August 16, 2018, was medically necessary as defined by the Policy. As noted above, to be considered medically necessary, treatment must satisfy the following requirements: (a) be widely accepted as effective; (b) be appropriate for the condition or diagnosis; (c) be essential, based upon nationally accepted evidence-based standards; (d) cost no more than a treatment that is likely to yield a comparable health outcome; and (e) be the most appropriate level of care and site of service that can be safely and reasonably provided to the Member.

Defendant's repeated concession that J.S. made significant progress while in the NBU establishes that the treatment J.S. was receiving at KKI, and was likely to receive after August 16, 2018, was effective and appropriate to treat her impairments and circumstance. That such treatment was essential seems obvious considering the inability of J.S. to make significant gains or progress prior to treatment at KKI. Moreover, there is nothing in the record suggesting that J.S. could have received

comparable care or outcomes in a less intensive setting. Finally, while "custodial care" for mental health services is a "non-covered" service under the Policy, there is nothing in the record supporting the argument that J.S. was receiving, as of August 16, 2018, or likely to receive subsequent to this date, custodial care at KKI.

Simply put, as of August 16, 2018, J.S. was entitled to insurance coverage for the treatment she was receiving at KKI. Defendant's conclusion to the contrary fails under any standard of review including the more deferential "arbitrary or capricious" standard. *See, e.g., Judge v. Metropolitan Life Ins. Co.*, 710 F.3d 651, 657-58 (6th Cir. 2013) (a plan administrator's decision is arbitrary or capricious where such is not supported by "a reasoned explanation, based on the evidence").

V. Defendant's Additional Arguments

Defendant alludes, in its pleadings, to two additional reasons to deny Plaintiff's claim. First, Defendant argues that coverage for J.S.'s treatment at KKI was no longer available once J.S. reached the age of 18. (ECF No. 15, PageID.4642-43). Second, Defendant argues that because Plaintiff, J.S.'s mother, "does not have an individual cause of action," her "individual claims should be dismissed." (*Id.*, PageID.4643).

Taking the latter argument first, such is rejected because it has not been properly developed. Defendant's three-line argument, devoid of citation to authority or the record, is insufficient. *See, e.g., United States v. Stewart*, 628 F.3d 246, 256 (6th Cir. 2014) (asserting a claim "in a perfunctory manner, unaccompanied by some effort at developed argumentation" constitutes waiver of such claim). Even if addressed on the

-15-

merits, Defendant's argument is without merit. Plaintiff, as J.S.'s guardian, has standing to bring the present action. *See* 29 U.S.C. § 1132(a). Moreover, there is nothing in Plaintiff's complaint suggesting that she has asserted an "individual claim." Instead, Plaintiff asserts that Defendant's denial of coverage for J.S.'s treatment was erroneous and that Defendant, therefore, should cover the costs of J.S.'s treatment at KKI after August 16, 2018, and pay Plaintiff's reasonable attorney's fees incurred in bringing this action. The Court fails to discern any "individual claim" asserted by Plaintiff.

Defendant also argues that Plaintiff's claims should be denied because J.S. was beyond the age of 18 as of August 16, 2018. The Court finds that this argument has likewise been waived by failure to develop such. *See Stewart*, 628 F.3d at 256. In support of this argument, Defendant has cited to a policy provision indicating that coverage to treat Autism Spectrum Disorder is available "through the age of 18." (ECF No. 13-33, PageID.2433-34).

This argument may, at first glance, appear persuasive as J.S. was 19 years old as of August 16, 2018. Defendant's argument, however, ignores and fails to address at least two relevant facts that weigh against its position: (1) Defendant initially approved J.S.'s treatment despite the fact she turned 19 years old only 3 days after her admission to KKI, and thus willingly agreed to cover J.S.'s treatment for several months despite the fact she was beyond 18 years of age; and (2) Defendant did not previously argue

below that coverage should be denied on the basis of J.S.'s age.[6]  Defendant's failure to address these facts and develop an argument in support of its position compels the conclusion that Defendant has waived this argument.

VI.  Remedy

Having concluded that Defendant's denial of coverage decision was improper, the question becomes the remedy to which Plaintiff is entitled.  The Sixth Circuit has indicated that in circumstances such as this, the Court has two options: (1) award benefits to the claimant or (2) remand the matter to the plan administrator.  *See, e.g., Shaw*, 795 F.3d at 551.

In her amended complaint, Plaintiff requests that the Court order Defendant "to cover the full cost and expenses of J.S.'s treatment in the NBU program from August 16, 2018 through discharge." (ECF No. 9).  Plaintiff has failed, at this juncture, to demonstrate entitlement to this relief.  While it is evident that J.S. was entitled to treatment coverage beyond August 16, 2018, determining the extent to which such coverage should have been extended requires factual determinations this Court is simply not qualified to make in the first instance.  Moreover, even if the Court were

---

[6] Defendant argues that Plaintiff is barred from asserting, in this Court, certain arguments because such were not asserted during the administrative review process. (ECF No. 15, PageID.4363-37).  As Defendant notes, the Sixth Circuit has observed that it "will not address issues on appeal that were not raised and ruled upon below." *Dotson v. Arkema, Inc.*, 397 Fed. Appx. 191, 193 (6th Cir., Sept. 28, 2010).  While this observation appears to apply to arguments the parties failed to raise in the district court, rather than during the administrative process, the inconsistency of Defendant's position vis-à-vis waiver of arguments not raised below is nevertheless noted.

competent to make such determinations, this issue has not been adequately developed by the parties.

As the Sixth Circuit has held, "where the problem is with the integrity of the plan's decision-making process, rather than that a claimant was denied benefits to which [she] was clearly entitled, the appropriate remedy generally is remand to the plan administrator." *Shaw*, 795 F.3d at 551. Accordingly, the undersigned recommends that this matter be remanded to Defendant for a determination of the extent to which J.S. was entitled to coverage beyond August 16, 2018. It is further recommended that this Court retain jurisdiction of this matter so that any subsequent disputes arising from Defendant's subsequent coverage determination can be resolved as expeditiously as possible.

VII. Attorney's Fees and Costs

Plaintiff also requests that the Court order Defendant to reimburse the reasonable attorney's fees and costs she incurred in bringing the present action. Plaintiff may very well be entitled to such relief. *See* 29 U.S.C. § 1132(g). But this issue has not been properly briefed by the parties. Moreover, prudence dictates that consideration of this issue be deferred until after the Honorable Paul L. Maloney has the opportunity to address any objections which the parties may advance to this Report and Recommendation. Accordingly, the undersigned recommends that Plaintiff's request for attorney's fees and costs be denied without prejudice.

## CONCLUSION

For the reasons articulated herein, the undersigned recommends that Defendant's Motion to Affirm the Administrator's Decision (ECF No. 15) be denied, and Plaintiff's Motion for Entry of Judgment (ECF No. 14) be granted in part and denied in part. With respect to this latter recommendation, the undersigned specifically recommends that: (1) Defendant's decision denying coverage for J.S.'s continued inpatient treatment at KKI was improper and must, therefore, be rejected; (2) this matter be remanded to Defendant for another benefits coverage determination; (3) the Court retain jurisdiction of this matter; and (4) Plaintiff's motion for attorney's fees and costs be denied without prejudice.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

Respectfully submitted,

Date: August 3, 2021

/s/ Phillip J. Green
PHILLIP J. GREEN
United States Magistrate Judge